**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>ABDUL HAKIM SHAHEED MANNAN and ABDUL HAKIM MANNAN | No. 23cr805 (EP)<br><br>**OPINION** |

**PADIN, District Judge.**

Defendants Abdul Hakim Shaheed Mannan ("Mannan Sr.") and Abdul Hakim Mannan ("Mannan Jr.") each move for various pretrial relief. D.E. 78 ("Mannan Sr. Motion" or "Sr. Mot."); D.E. 79 ("Mannan Jr. Motion" or "Jr. Mot.") (together, the "Motions").[1] The Government opposes. D.E. 94 ("Opposition" or "Opp'n"). Defendants reply. D.Es. 95 ("Jr. Reply") & 96 ("Sr. Reply").

After the Motions were fully briefed, the Government responded separately to Mannan Sr.'s challenge to the appointment of former Interim U.S. Attorney Alina Habba. D.E. 97 ("Gov't Letter"). Mannan Sr. answered. D.E. 98 ("Sr. Letter"). The Court now writes to resolve: (1) Mannan Sr.'s request to dismiss the Superseding Indictment or to disqualify Habba; (2) Defendants' requests to dismiss their felon-in-possession counts under the Second Amendment; (3) Mannan Sr.'s request to suppress the evidence seized from Defendants' residence; (4) Mannan Jr.'s request to dismiss or suppress for failure to preserve evidence; (5) Defendants' requests to sever their trials; and (6) Defendants' discovery requests. *See* Sr. Mot.; Jr. Mot.

[1] Mannan Sr.'s notice of motion, enumerating eleven requests for relief, is at D.E. 78 at 1–2. Mannan Jr.'s notice of motion, enumerating nine requests for relief, is at D.E. 79 at 1–3. Each notice incorporates the memorandum of law filed with it in the same docket entry.

For the reasons set forth below, the Court will **GRANT in part** and **DENY in part** the Motions. Neither Motion requires an evidentiary hearing.

## I. BACKGROUND[2]

### A. Investigation and Warrant

The Drug Enforcement Administration ("DEA") began investigating Defendants in late October 2022. D.E. 1, Attachment B, Complaint Affidavit of DEA Agent Abdullah Holmes ("Holmes Affidavit" or "Compl. Aff.") ¶ 1. Between November 2022 and July 2023, undercover officers ("UCs") made a series of controlled purchases of oxycodone and heroin from Defendants by contacting a telephone number allegedly associated with Mannan Jr. *See id.* ¶¶ 1–18.

On October 31, 2022, a UC contacted Mannan Jr.—using the alias "Jerry"—and arranged to purchase ten oxycodone pills for $450. Compl. Aff. ¶¶ 1–5. The UC followed up on November 3, 2022. *Id.* Mannan Jr. instructed the UC to have an associate (a second UC) meet him at a specific location in Newark, New Jersey. *Id.*

Law enforcement had established fixed surveillance at Defendants' joint residence at 325 West Runyon Street, Newark, New Jersey (the "Residence"), and saw Mannan Jr. leave the Residence and arrive at the meeting location shortly thereafter. *Id.* Mannan Jr. then sold the UC ten oxycodone pills. *Id.* ¶ 5.

The UCs contacted the same number on five later occasions, each time seeking to purchase additional narcotics. *See id.* On November 21, 2022, the UCs again contacted Mannan Jr. to arrange another oxycodone purchase. *Id.* ¶¶ 6–10. Law enforcement conducted surveillance of Mannan Jr. before the purchase, and Mannan Jr. provided instructions to meet at a prearranged

[2] When deciding a motion to suppress, "the court may rely on hearsay and other evidence, even though that evidence would not be admissible at trial." *United States v. Raddatz*, 447 U.S. 667, 679 (1980).

location in Newark. *Id.* At that location, the UC met with Mannan Sr. and purchased ten oxycodone pills; the transaction was recorded. *Id.* Mannan Sr. informed the UC that he would contact another individual to obtain bricks of heroin to sell to the UC. *Id.* Before parting ways, Mannan Sr. called Mannan Jr. to confirm completion of the pill sale. *Id.* Shortly afterward, Mannan Sr. directed the UC to a house on South 13th Street in Newark. *Id.*

On December 1, 2022, the UCs ordered twenty oxycodone pills from Mannan Jr. *Id.* ¶ 11. Mannan Jr. instructed the UC to go to a specific location, where Mannan Sr. sold the twenty pills to the UC. *Id.* The UC then asked Mannan Sr. to obtain four bricks of heroin. *Id.* Law enforcement watched Mannan Sr. leave the meeting location, return to the Residence, and use a phone several times. *Id.* ¶ 12. Mannan Sr. then contacted the UC and provided a location for the heroin purchase. *Id.* ¶ 13. At that location, Mannan Sr. sold four bricks of heroin to the UC. *Id.* Mannan Jr. allegedly made a separate oxycodone sale on July 10, 2023. Opp'n at 4; Jr. Mot. at 4.

On July 11, 2023, the UCs again contacted the Mannan Jr. phone, and Mannan Sr. sold the UC ten oxycodone pills and one brick of heroin. *Id.* ¶ 15. On July 25, 2023, Mannan Jr. sold the UC twenty oxycodone pills, and Mannan Sr. later that day sold the UC a brick of heroin. *Id.* ¶¶ 16–18.

The DEA's investigation also included surveillance of the Residence. The warrant affidavit described the Residence as a two-family house with two mailboxes. D.E. 78-4, Attachment C, Warrant Affidavit of DEA Agent Abdullah Holmes ("Warrant Affidavit" or "Warrant Aff.") ¶ 7. Both Defendants had "relationships with the registered occupants of both floors of the house" and "freely enter[ed] and exit[ed the Residence] at various times of the day and night." *Id.* The investigation found that both Defendants had "dominion and control over

both floors" of the Residence and "are related in familial and other ways with the other occupants." *Id.* ¶ 9. Mannan Jr. was stopped twice driving the second-floor occupant's car and had lived with several of the Residence's occupants at a prior address.[3] *Id.* ¶¶ 8–9. Additionally, Mannan Sr. took garbage cans to the curb for the entire house. *Id.* ¶ 7. As for the Residence's layout, the DEA was unsure "whether the house is one contiguous space or whether each floor is a separate apartment with separate entry doors." *Id.* at 4 n.1.

Based on the investigation's findings, the DEA applied for search warrants for the Residence and a 2014 black Dodge minivan registered to Mannan Jr. (the "Minivan"). *See* D.E. 78-3, Investigation Report by DEA Task Force Officer Brandon Nemes ("Nemes Report") at 1. U.S. Magistrate Judge Andre M. Espinoza issued the Residence warrant (the "Warrant") and the Minivan warrant on August 23, 2023. *Id.*[4] After completing the Residence search the next morning, agents searched the Minivan and recovered no evidence. *Id.* at 4.

**B. Residence Search and Evidence Seizure**

Agents executed the Warrant early in the morning on August 24, 2023. *Id.* at 1–3. At the Residence, agents knocked and announced, received no answer, breached the front door, and entered. *Id.* at 1–2. Ten people were inside: eight residents on the first and second floors and both

[3] The vehicle belonged to Myrna Brown, whom utility records identified as the Residence's registered second-floor occupant and whom Mannan Jr. identified to police during a 2017 stop as his mother. Warrant Aff. ¶ 8. The Warrant Affidavit linked Mannan Jr., Brown, Elamin Mannan, and Helen Cathcart to a prior address at 824 South 17th Street in Newark. *Id.* ¶¶ 8–9. From that overlap, Agent Holmes inferred that every occupant of the Residence—except Sadie Cathcart, who had lived there since 2013—had moved to the Residence after living together on South 17th Street. *Id.* ¶ 9.

[4] The Nemes Report initially listed the Residence as 825 West Runyon Street. A later DEA correction report states that 825 was erroneous and that the correct address is 325 West Runyon Street. D.E. 78-3 at 12.

Defendants in the basement. *Id.* at 2. Agents detained residents with zip ties, including a minor. D.E. 78-2, Affidavit of Assistant Federal Public Defender Colleen Flanagan ("Flanagan Aff.") ¶ 3. Searches of the first and second floors "came back with negative results for any evidence." Nemes Report ¶ 6. The basement search, however, "came back with positive results." *Id.*

The following items were attributed to Mannan Jr.: (1) suspected blue oxycodone pills; (2) suspected unknown orange narcotic pills; (3) three phones; (4) a Norinco MAK-90 Sporter rifle (the "Rifle"); (5) forty-two rounds of .40-caliber ammunition; (6) thirty-two rounds of 7.62-caliber ammunition; (7) a seven-round magazine; and (8) a large-capacity drum magazine.[5] Nemes Report ¶ 7; *see* D.E. 79-4 ("Ennesser Report") at 3.

The following items were attributed to Mannan Sr.: (1) seven cell phones; (2) a Taurus .357 Magnum revolver (the "Revolver");[6] (3) eight rounds of .40-caliber ammunition; (4) three ink pads; and (5) a ledger. Nemes Report ¶ 8; *see* Ennesser Report ¶ 7.

### C. Conflicting Accounts Regarding the Revolver

The record contains three inconsistent accounts of where the Revolver was recovered.

*Nemes Report.* The Nemes Report—prepared on August 28, 2023, four days after the search—states that the Revolver was recovered in two different locations. *See* Nemes Report. It states that, as Mannan Sr. "was taken into custody, search incident to arrest, SRT located [the Revolver] on his person." Nemes Report ¶ 5. The same report also lists the Revolver among the

[5] Mannan Jr.'s Motion attaches a photograph of the drum magazine and states that the "drum was covered in rust and dust," from which he infers that it "had been stored, in an undocumented place, for some time." Jr. Mot. at 7 (citing Ex. D-3).

[6] The Nemes Report and the Ennesser Report conflict as to where the Revolver was recovered. *See infra* Section I.C.

items recovered from the basement's left bedroom and states that both Defendants were arrested in the basement. *Id.* ¶¶ 4, 8.

*Ennesser Report.* A separate report was prepared on September 8, 2023, by Special Agent George Ennesser, who participated in the search. *See* Ennesser Report. Agent Ennesser encountered Mannan Sr. zip-tied to a chair in the first-floor dining and living room.[7] *Id.* ¶¶ 3–4. According to Agent Ennesser, Mannan Sr. asked to use the bathroom. *Id.* While Mannan Sr. was sitting on the toilet, Agent Ennesser and Special Agent Rushang Patel "discovered [the Revolver] wrapped in a black rag in [Mannan Sr.'s] sweat jacket which he had placed on the bathroom floor." *Id.* ¶ 4. Mannan Sr. stated that the Revolver[8] was his and that he had grabbed it in his basement bedroom "to 'get the drop' on what he thought was a robbery when he heard Agents knocking and announcing." *Id.* Agent Ennesser then informed Mannan Sr. that he was under arrest and verbally advised him of his Miranda rights. *Id.*

**D. Documentation of the Search**

The parties appear to agree that the search of the Residence was not video recorded. Mannan Jr. represents that the Government advised that no video was taken, Jr. Mot. at 5, and the Government characterizes the alleged deficiency as a failure to create records rather than a failure to preserve existing evidence, Opp'n at 11. According to Defendants, the agents did not photograph the Residence's condition before or after the search, nor did they photograph seized items where they were found. Jr. Reply at 2; Sr. Reply at 1 (joining Mannan Jr.'s Reply).

---

[7] Mannan Jr.'s Motion attaches a search photograph that allegedly shows both Defendants zip-tied on the first floor. D.E. 79-5, Ex. D-6.

[8] The Ennesser Report states that the Revolver was reported stolen in Pennsylvania in 2014. Ennesser Report ¶ 7. A ballistics report states that the Revolver's cylinder was "severely rusted and had to undergo an oil soak for several hours to return into operating state." D.E. 96-2 ("Revolver Ballistics Report").

Defendants also contend that evidentiary photographs were taken at close range or after items had been moved from their original locations. *See* Jr. Mot. at 5–7.

- An ammunition box attributed to Mannan Jr.'s right bedroom was photographed on a couch in the basement common area. D.E. 79-5, Ex. D-1.
- The Rifle and drum magazine were photographed together on that couch even though Defendants contend they were recovered from different locations. *Id.*, Exs. D-2 & D-3.
- The orange pills were photographed at close range, with little of the surrounding area visible. *Id.*, Ex. D-5.
- A shoebox containing a key holder with blue pills was photographed without its surroundings visible. *Id.*, Ex. D-4.
- An unsigned October 2022 bank-account application bearing Mannan Jr.'s name was photographed at close range; Defendants contend that the remaining documents in the stack were not catalogued. *Id.*, Ex. D-7.

**E. Warrant Copy Dispute**

During the search, residents asked the agents for the warrant multiple times. Flanagan Aff. ¶ 3. The agents responded that the warrant was "in the van" and that they would "show it to [them] later." *Id.* After the search, once in the car, Mannan Sr. again asked to see the warrant, to which an agent responded, "We got it. We got it." *Id.* A copy of the Warrant was not provided to a resident or left at the Residence, and defense counsel first obtained it during discovery in April 2024. Sr. Mot. at 4; D.E. 96-1 ("Mannan Sr. Affidavit" or "Mannan Sr. Aff.") ¶¶ 1–3. Although the Government challenges the evidentiary value of the Flanagan and Mannan Sr. affidavits, it

does not deny that the agents failed to give or leave a copy of the Warrant. *See* Opp'n at 12–14; Sr. Reply at 6.

### F. The Charges

A criminal Complaint charging narcotics offenses issued on August 23, 2023—the day before the Residence search—and both Defendants were arrested the next morning after that search. D.E. 1 ("Complaint") at 1; Sr. Mot. at 2; Opp'n at 5. Mannan Sr. was released on pretrial conditions. Sr. Mot. at 2. On May 14, 2025, a grand jury returned a fourteen-count Superseding Indictment against both Defendants. D.E. 55 ("Superseding Indictment" or "SI"). Defendants are charged together in five of the fourteen counts. *Id.* at 1–5, 8, 10.

- Count One: Charges both Defendants with conspiracy to distribute and possess with intent to distribute oxycodone from October 2022 through August 2023;
- Counts Two, Seven, and Twelve: Charge Mannan Jr. alone with distributing and possessing with intent to distribute oxycodone on November 3, 2022; July 10, 2023; and August 24, 2023;
- Counts Three, Five, Eight, and Ten: Charge both Defendants with distributing and possessing with intent to distribute oxycodone on November 21, 2022; December 1, 2022; July 11, 2023; and July 25, 2023;
- Counts Four, Six, Nine, and Eleven: Charge Mannan Sr. with distributing and possessing with intent to distribute fentanyl on those same four dates;
- Count Thirteen: Charges Mannan Jr. with possessing, as a convicted felon, the Rifle and seventy-four rounds of ammunition on August 24, 2023; and
- Count Fourteen: Charges Mannan Sr. with possessing, as a convicted felon, the Revolver on August 24, 2023.

*See* SI at 1–14. Counts One through Twelve are brought under 21 U.S.C. § 841(a)(1), (b)(1)(C), with Count One charged in violation of 21 U.S.C. § 846; Counts Thirteen and Fourteen are brought under 18 U.S.C. § 922(g)(1). *Id.* The SI also contains two forfeiture allegations. *Id.* at 15–16.

The SI was signed by Alina Habba, who was then serving as interim United States Attorney for this District, and its cover sheet identifies Robert L. Frazer as the Assistant United States Attorney assigned to the case. *See* SI at 17–18.

### G. Defendants' Criminal Histories

Mannan Jr. has two prior felony convictions, both New Jersey state drug offenses, and neither more recent than 2010. Jr. Mot. at 15. On August 8, 2008, following a guilty plea, he was convicted of one count of distributing a controlled dangerous substance—heroin—in violation of N.J. Stat. Ann. § 2C:35-5(b)(2). Jr. Mot. at 15. On March 29, 2010, on a separate 2008 arrest, he was convicted of conspiracy to manufacture or distribute a controlled dangerous substance in violation of N.J. Stat. Ann. § 2C:5-2. Jr. Mot. at 15.

Mannan Sr.'s history is longer and older. In 1972, he was convicted of robbery and receipt of stolen property, receiving 5- and 7-year sentences, respectively. Sr. Mot. at 4. In 1999, he was convicted of forgery, falsifying records, and criminal attempt theft by deception, receiving a 5-year sentence. *Id.* In 2000, he was convicted of distributing a controlled dangerous substance and resisting arrest, receiving a 3-year sentence. *Id.* And in 2014, he was convicted in state court of theft by deception, receiving 364 days' confinement and 3 years' probation; that probation was extended by a year following a 2017 violation. *Id.* The Government describes Mannan Sr.'s convictions as comprising eight felony offenses. Opp'n at 6.

### H. Procedural History and Pending Motions

A grand jury returned the SI on May 14, 2025. *See* SI. Mannan Jr. was arraigned before this Court on May 27, 2025, pleaded not guilty, and was remanded to custody. D.E. 60. Mannan Sr. was arraigned separately and also pleaded not guilty. D.E. 61; Sr. Mot. at 3.

The Court set a pretrial motion schedule on August 13, 2025. D.E. 68. At the parties' joint request, the Court modified that schedule on September 22, 2025. D.E. 74.

Mannan Sr. filed his Motion on October 20, 2025, and Mannan Jr. filed his Motion the next day. Sr. Mot.; Jr. Mot. The Government twice sought and received additional time to respond. *See* D.Es. 89–93. It filed a consolidated opposition on December 15, 2025, addressing the arguments in Defendants' Motions except Mannan Sr.'s challenge to Alina Habba's appointment. *See* Opp'n. Both Defendants replied on January 12, 2026. Jr. Reply; Sr. Reply.

The Government answered the appointment challenge separately by letter filed January 14, 2026. Gov't Letter. The Letter reports that Habba resigned from the United States Attorney's Office on December 8, 2025, and attaches three orders entered by Chief Judge Brann on December 15, 2025, each denying a materially similar disqualification request as moot and returning the case to its originally assigned judge. *Id.* at 1 & Exs. 1–3. The Letter also represents that Habba played no role in reviewing, approving, or presenting the SI to the grand jury and offers to submit grand jury and internal-review materials *ex parte* for in camera review. *Id.* at 2. Mannan Sr. replied on January 21, 2026. Sr. Letter.

While the Motions were pending, the Court denied Mannan Jr.'s motion for release from custody. D.Es. 72 & 87. Both Defendants request an evidentiary hearing. Sr. Mot. at 2; Jr. Mot. at 1–2. The Motions are fully briefed.

## II. MANNAN SR.'S MOTION TO DISMISS OR DISQUALIFY BASED ON ALINA HABBA'S APPOINTMENT AS U.S. ATTORNEY

Mannan Sr. contends that Habba was not lawfully serving as U.S. Attorney when she signed the SI and seeks two things: (1) dismissal of the SI or, alternatively, (2) disqualification of Habba as U.S. Attorney. The disqualification request is denied as moot because Habba is no longer U.S. Attorney. Mannan Sr.'s request to dismiss the SI fails because (1) Habba was lawfully serving as interim U.S. Attorney when the SI was returned; and (2) even if she were not, dismissal would not be the proper remedy.

### A. The Appointment Timeline

When the U.S. Attorney's Office for a district is vacant, the Attorney General may appoint an interim U.S. Attorney for that district. 28 U.S.C. § 546(a). The appointee may serve until a U.S. Attorney appointed by the President qualifies for office *or* until "the expiration of 120 days after appointment by the Attorney General," whichever comes first. *Id.* § 546(c)–(d). If the 120-day period expires while the vacancy remains, "the district court for such district may appoint a United States attorney to serve until the vacancy is filled." *Id.*

On March 3, 2025, the Attorney General appointed John Giordano as interim United States Attorney for this District under 28 U.S.C. § 546(a). *See United States v. Giraud*, 160 F.4th 390, 395 (3d Cir. 2025) ("*Giraud II*"). Giordano's appointment triggered the aggregate 120-day period. *See Giraud II*, 160 F.4th at 395. When Giordano departed, the Attorney General appointed Habba to the same interim post effective March 28, 2025. *Giraud II*, 160 F.4th at 395.

The SI was returned on May 14, 2025, within that 120-day period. The appointment litigation arose from later events. The aggregate period expired on July 1, 2025, after which the judges of this District appointed a successor under § 546(d). *See Giraud II*, 160 F.4th at 395–96. The Department of Justice terminated that successor's employment and appointed Habba as First

Assistant U.S. Attorney, purportedly allowing her to become Acting U.S. Attorney under the Federal Vacancies Reform Act ("FVRA"). *Id.* The Third Circuit held that effort unlawful because only the first assistant in place when the vacancy arose could automatically assume the office under 5 U.S.C. § 3345(a)(1). *See Giraud II*, at 406–07. Habba resigned from the U.S. Attorney's Office on December 8, 2025. Gov't Letter at 1.

### B. Mannan Sr.'s Disqualification Request Is Moot

Mannan Sr. asks the Court to bar Habba, and any Assistant U.S. Attorney acting at her direction, from this prosecution. Habba resigned from the U.S. Attorney's Office on December 8, 2025. Gov't Letter at 1. After that resignation, Chief Judge Brann denied materially similar requests to disqualify Habba as moot. *Id.* & Exs. 1–3. Because Habba is no longer U.S. Attorney, the requested prospective relief is no longer available and is therefore **DENIED** as **MOOT**.

Mannan Sr.'s request as to the line prosecutors fails for the same reason. He asks the Court to bar attorneys acting at her direction. Sr. Mot. at 5. *Giraud I* held that disqualifying a subordinate attorney presents "a fact-based question" turning on whether the attorney "is operating at the express direction of an offici[al] who is improperly appointed," and requires "individualized fact finding about the chain of command in each instance." *Giraud I*, 795 F. Supp. 3d at 607. Habba's resignation forecloses that showing because no attorney in this District now prosecutes at her direction. And Mannan Sr. has not identified an attorney of record in this case whose authority derives from Habba rather than from the Attorney General, who appoints Assistant U.S. Attorneys. 28 U.S.C. §§ 516, 542(a); *see United States v. Hilario*, 218 F.3d 19, 26 (1st Cir. 2000) (noting that an Assistant U.S. Attorney's "ability to act does not hinge on the authority of the local United States Attorney"). This request, too, is therefore **DENIED** as **MOOT**.

### C. Habba Was Lawfully Serving as Interim U.S. Attorney When the Superseding Indictment Was Returned

Mannan Sr.'s dismissal request rests on a single premise: that 28 U.S.C. § 546 permits only one Attorney General interim appointment per vacancy, which, in his view, rendered Habba's appointment invalid after Giordano stepped down. Sr. Mot. at 8–12. That premise fails.

Section 546(a) permits the Attorney General to "appoint a United States attorney" for a district where the office "is vacant," and § 546(c) provides that "[a] person appointed . . . under this section may serve until" a presidentially appointed successor qualifies or "the expiration of 120 days after appointment by the Attorney General under this section." 28 U.S.C. § 546(a), (c). In *United States v. Giraud*, Chief Judge Brann rejected the same single-appointment argument. 795 F. Supp. 3d 560, 578–82 (D.N.J. 2025) ("*Giraud I*"), *aff'd on other grounds*, 160 F.4th 390 (3d Cir. 2025). *Giraud I* held that § 546 contains no one-person limit during the aggregate 120-day period and therefore permits a personnel change before that period expires. *Id.* at 579–80.

Although *Giraud I* is not binding,[9] the Court agrees with its construction of § 546. The SI was returned on May 14, 2025, well within the aggregate 120-day period that began with Giordano's appointment. Thus, Habba was lawfully serving as interim United States Attorney when she signed the SI.

Mannan Sr.'s principal contrary authority is a 1986 memorandum from the Office of Legal Counsel ("OLC"), written by then-Deputy Assistant Attorney General Samuel A. Alito, Jr.[10]

---

[9] The Third Circuit's affirmance addressed Habba's post-July FVRA service and expressly declined to consider the validity of her March 28, 2025 interim appointment. *See Giraud II*, 160 F.4th at 396 n.2.

[10] *See* Memorandum from Samuel A. Alito, Jr., Deputy Assistant Att'y Gen., Off. of Legal Couns., to William P. Tyson, Dir., Exec. Off. for U.S. Att'ys, at 3 (Nov. 13, 1986) (the "OLC Memorandum").

Sr. Mot. at 10–11. The OLC Memorandum states that "it would appear that Congress intended to confer on the Attorney General only the power to make one interim appointment." OLC Memorandum at 2. The Court does not discount that Executive Branch interpretation, but it does not bind this Court. *See Madison v. Res. for Hum. Dev.*, 233 F.3d 175, 186 (3d Cir. 2000) ("[I]nformal agency interpretations are not binding, but are entitled to respect to the extent they are persuasive.").

The Court instead agrees with *Giraud I*'s textual analysis. Section 546(a) contains no express one-appointment limitation, while § 546(c)(2) fixes an aggregate 120-day period beginning with the Attorney General's first appointment. *Giraud I*, 795 F. Supp. 3d at 579–80. The OLC Memorandum's contrary reading is entitled to consideration, but it does not overcome that text. Mannan Sr.'s single-appointment argument therefore fails.[11]

**D. In the Alternative, Dismissal Would Not Be the Remedy**

Even if Habba's appointment had been invalid, dismissal of the SI would not follow. An indictment must be "signed by an attorney for the government." Fed. R. Crim. P. 7(c)(1).[12] But a signature defect does not undo the grand jury's action because the signature is "necessary only as evidence of the authenticity of the document," is "nonjurisdictional," and is subject to harmless-error analysis. *Giraud I*, 795 F. Supp. 3d at 605–06 (citing *United States v. Easton*, 937 F.2d 160, 162 (5th Cir. 1991)).

*Giraud I* denied dismissal because the charging decision belongs to the grand jury, regardless of whether Habba's signature was defective. *Id.* at 605–06. The grand jury is a

[11] The OLC later described its 1986 conclusion as a "suggest[ion]" while construing the parallel statute governing interim United States Marshals. Authority of the Attorney General to Make Successive Designations of Interim United States Marshals, 17 Op. O.L.C. 1, 3 n.5 (1993).
[12] Unless otherwise stated, all references to a "Rule" or "Rules" are to the Federal Rules of Criminal Procedure.

"constitutional fixture in its own right," and dismissal generally requires misconduct that prejudiced the defendant in the grand jury proceeding. *Id.*; *see United States v. Naviwala*, Crim. No. 24-99, 2026 WL 1031149, at *4 (D.N.J. Apr. 16, 2026) ("Dismissal of the indictment is a drastic remedy, and the general rule is that remedies should be tailored to the injury suffered from the constitutional violation and should not unnecessarily infringe on competing interests." (citation modified)).

Dismissal here would be improper. The Government represents that Habba "played no role whatsoever in reviewing, approving or presenting to the grand jury" the SI. Gov't Letter at 2. Moreover, the investigation and original charges predated Habba's appointment by more than a year and a half. *See* Complaint.

Mannan Sr.'s cited authorities are not to the contrary; each involved a prosecution the invalidly appointed officer personally drove. In *United States v. Trump*, the Special Counsel alone signed the superseding indictment, and the court dismissed because acts flowing from his defective appointment were unlawful exercises of executive power. 740 F. Supp. 3d 1245, 1303 (S.D. Fla. 2024). In *United States v. Comey*, the interim United States Attorney "acted alone in conducting a grand jury proceeding and securing an indictment." Crim. No. 25-272, 2025 WL 3266932, at *15 (E.D. Va. Nov. 24, 2025). Here, Habba was not involved in the investigation leading up to the SI or in the grand jury proceeding leading to it. *See* Gov't Letter at 2 ("Habba played no role whatsoever in reviewing, approving or presenting to the grand jury the Superseding Indictment.").

Next, Mannan Sr. invokes § 3348(d) of the FVRA, which provides that certain actions taken without lawful acting authority "shall have no force or effect." 5 U.S.C. § 3348(d)(1); Sr. Mot. at 11. That argument does not change the analysis. Section 3348(d) does not apply to the SI. Habba was not purporting to act under the FVRA on May 14, 2025; she was serving as

interim U.S. Attorney under 28 U.S.C. § 546(a), an office-specific mechanism the FVRA expressly preserves. *See* 5 U.S.C. § 3347(a)(1)(A). And even if § 3348(d) applied, it reaches only nondelegable duties. The Act defines "function or duty" as one a statute requires "the applicable officer (and only that officer)" to perform. 5 U.S.C. § 3348(a)(2)(A)(ii). The Third Circuit has read that parenthetical to confine § 3348 to authority the officer cannot delegate. *See Kajmowicz v. Whitaker*, 42 F.4th 138, 148–52 (3d Cir. 2022). Signing an indictment is not the exclusive province of a United States Attorney. Rule 7(c)(1) calls for the signature of "an attorney for the government," which includes an authorized assistant. Fed. R. Crim. P. 1(b)(1)(B), (D); 28 U.S.C. §§ 542(a), 547.

**E. No In Camera Review Is Warranted**

Mannan Sr. asks the Court to order the Government to submit grand jury materials ex parte for in camera review and to produce documents bearing on Habba's role in shaping the charges. Sr. Mot. at 13. The Government has offered to make an in camera submission. *See* Gov't Letter at 2. Because Habba was lawfully appointed when she signed the SI, the Court finds the requested review unnecessary. His companion request for internal charging documents also falls outside Rule 16. Fed. R. Crim. P. 16(a)(2). Accordingly, Mannan Sr.'s requests for grand jury materials and internal documents are **DENIED**.

* * *

Mannan Sr.'s challenge to Habba's appointment fails. Section 546 permitted the Attorney General's successive interim appointment within the aggregate 120-day period, so Habba was lawfully serving as interim U.S. Attorney when the grand jury returned the SI. Even if she were not, dismissal would not be the proper remedy. Mannan Sr. has not made the showing required

for disclosure of grand jury materials, and Habba's resignation leaves no prospective disqualification relief to grant.

Accordingly, Mannan Sr.'s request to disqualify Habba is **DENIED** as **MOOT**. His request to dismiss the SI is **DENIED**. And his requests for grand jury materials and internal documents are **DENIED**.

## III. MOTIONS TO DISMISS THE § 922(g)(1) COUNTS

Both Defendants move to dismiss their felon-in-possession counts under Rule 12(b)(3), contending that 18 U.S.C. § 922(g)(1) is unconstitutional on its face and as applied to each of them. Jr. Mot. at 14–16; Sr. Mot. at 14–26.

The Motions rest on a shift in Second Amendment law. The Second Amendment secures an individual right to keep and bear arms. *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008). In *New York State Rifle & Pistol Ass'n v. Bruen*, the Supreme Court rejected means-end interest balancing for firearm regulations and adopted an approach grounded in constitutional text and historical tradition. 597 U.S. 1, 17, 24 (2022). At the first step, the challenger must show that the Second Amendment's plain text covers the conduct at issue. *Id.* at 17. At the second step, the burden shifts to the Government, which must show that the regulation adheres to the Nation's historical tradition of firearm regulation. *Id.* at 24. Applying that framework, the Third Circuit held in *Range v. Attorney General* that § 922(g)(1) was unconstitutional as applied to a man whose sole disqualifying offense was a decades-old false statement to obtain food stamps. 124 F.4th 218, 232 (3d Cir. 2024) (en banc) ("*Range II*").

A felony conviction alone therefore does not end the inquiry. A person with a felony conviction remains among "the people" protected by the Second Amendment.[13] *Range II*, 124 F.4th at 226–28. And firearm possession is covered conduct at *Bruen* step one.[14] *See United States v. Moore*, 111 F.4th 266, 269 (3d Cir. 2024). *Moore* imposes no purpose-based limitation at step one. *See* 111 F.4th at 269. Step one is therefore satisfied, and the motions turn on *Bruen*'s second step.

The Motions turn on step two. At the second step, the Government need not produce a historical "twin," but only a historical analogue consistent with "the principles that underpin our regulatory tradition." *United States v. Rahimi*, 602 U.S. 680, 692 (2024). Applying that principle, *Rahimi* held that "[w]hen an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed." *Id.* at 698.[15] Courts must determine whether the particular defendant would likely pose a physical danger to others if armed. *See Pitsilides v. Barr*, 128 F.4th 203, 210–13 (3d Cir. 2025).

---

[13] The Court notes the Government's argument that persons with felony convictions are not among "the people" whom the Second Amendment protects. Opp'n at 23 n.2. As the Government acknowledges, *Range II* forecloses that contention in this Circuit, 124 F.4th at 226–28.

[14] The Government argues that the Rifle and the drum magazine are not "arms in common use" and fall outside the Second Amendment altogether. Opp'n at 27–28. The Third Circuit's recent en banc decision in *Ass'n of N.J. Rifle & Pistol Clubs v. Att'y Gen. N.J.* forecloses that argument. No. 24-2415, 2026 WL 2075513, at *12–15 (3d Cir. July 17, 2026) (en banc) ("*ANJRPC*") (holding that all firearms are "Arms" within the Second Amendment's text and that whether a firearm is in historical "common use" belongs to *Bruen*'s second step).

[15] *United States v. Hemani*, 146 S. Ct. 1677 (2026), does not bear on the Court's analysis. *Hemani* held § 922(g)(3) unconstitutional as applied to a marijuana user because the Government's historical evidence did not support disarming a person for drug use alone, without any showing that he posed a danger. *Id.* at 1687–89. The Court expressly declined to address "§ 922(g)(1)'s provision disarming individuals convicted of felonies (often including drug related ones)," and reserved prosecutions "accompanied by individualized proof" of dangerousness. *Id.* at 1693–94.

The inquiry is individualized, and the Court considers the person's entire criminal history, post-conviction conduct indicative of dangerousness, the predicate offense, and the conduct underlying that conviction. *Id.* at 212. Dangerousness is not confined to crimes formally classified as violent. *Id.* at 213 ("[Al]though residential burglary and drug dealing are not necessarily violent, they are dangerous because they often lead to violence."); *see also United States v. Walters*, 151 F.4th 122, 134 (3d Cir. 2025) (explaining that "dealing drugs runs the risk of violence").

Both Defendants' challenges fail at *Bruen*'s second step. Each Defendant's drug distribution history, considered with his particular circumstances, places him within the historical tradition of disarming those who would likely pose a physical danger to others if armed. Because the as-applied challenges fail, the facial challenges fail as well.

**A. Count Thirteen: Mannan Jr.**

Mannan Jr.'s predicates are two drug distribution felonies: a 2008 conviction for distributing heroin and a 2010 conviction for conspiracy to distribute a controlled dangerous substance. Jr. Mot. at 15. Mannan Jr. argues that § 922(g)(1) is unlawful as applied to him for three reasons: (1) his convictions are more than fifteen years old; (2) he has no conviction after 2010; and (3) he does not have a history of violence. *Id.* Citing these three reasons, Mannan Jr. attempts to draw parallels with the defendant in *Range II*. There, the court held that the Government had not carried its burden of showing a historical tradition of disarming people like Range (whose only conviction was food-stamp fraud), stressed the decades since Range's offense, and noted the absence of any evidence of danger. 124 F.4th at 232.

The Court is unpersuaded by Mannan Jr.'s attempt to align himself with Range. Range's disqualifying offense was a decades-old false statement to obtain food stamps that had no connection to physical danger. *Id.* And critically, the court in *Range II* took pains to clarify that

its holding "is a narrow one." *Id.* Unlike Range, Mannan Jr.'s predicates are drug distribution offenses—the very category *Pitsilides* identifies as dangerous because dealing drugs "often lead[s] to violence." 128 F.4th at 213. The Third Circuit has likewise treated drug trafficking convictions as relevant to the dangerousness inquiry. *See Walters*, 151 F.4th at 134 ("Unlike Range and his decades-old fraud conviction, it is not plain that someone convicted of three drug trafficking convictions does not pose a physical danger to others.").

The Court also looks to Mannan Jr.'s "particular circumstances," including facts beyond past convictions. *Moore*, 111 F.4th at 272–73. The Superseding Indictment charges Mannan Jr. with eleven trafficking-related counts arising from a retail oxycodone operation run out of the Residence. *See* SI. It also alleges that Mannan Jr. kept the Rifle, a large-capacity drum magazine, and ammunition in his bedroom and in a home with a minor. *Id.*; Nemes Report ¶ 7. Although the charges remain only allegations at this stage, the Court cannot ignore the Superseding Indictment's charges and the allegations connecting Mannan Jr. with both drugs and guns. *See Smith v. United States*, 508 U.S. 223, 240 (1993) (noting that "drugs and guns are a dangerous combination").

Courts in this District have reached the same conclusion after *Range II* and *Pitsilides*, denying as-applied challenges where the predicate convictions were drug trafficking offenses. *See, e.g.*, *United States v. Taylor*, Crim. No. 23-477, 2025 WL 2017122, at *16 (D.N.J. July 18, 2025) (finding that the defendant's "drug trafficking convictions alone [we]re enough to disarm him"); *United States v. Trusty*, Crim. No. 20-543, 2025 WL 830124, at *5–6 (D.N.J. Mar. 17, 2025) (holding that a gap of more than a decade between prior drug convictions and a § 922(g)(1) charge did not defeat the dangerousness showing).

On this record, the Government has carried its burden of showing that disarming Mannan Jr. adheres to the Nation's tradition of disarming those who would likely pose a physical danger to others if armed. Section 922(g)(1) is constitutional as applied to Mannan Jr., and the motion to dismiss Count Thirteen is **DENIED *without prejudice***.

**B. Count Fourteen: Mannan Sr.**

Mannan Sr.'s record is longer, older, and more varied than Mannan Jr.'s. Mannan Sr.'s record contains: (1) a 1972 conviction for robbery and receipt of stolen property; (2) a 1999 conviction for forgery, falsifying records, and criminal attempt theft by deception; (3) a 2000 conviction for distributing a controlled dangerous substance and resisting arrest; and (4) a 2014 conviction for theft by deception, on which probation was extended following a 2017 violation. Sr. Mot. at 4. Mannan Sr. concedes that this history is "serious," but argues that no founding-era tradition supports disarming "people like" him. *Id.* at 25–26.

The Court disagrees. Mannan Sr.'s 2000 drug distribution conviction is relevant to dangerousness for the same reasons as Mannan Jr.'s similar conviction and for the reasons *Pitsilides* identifies. 128 F.4th at 213. Mannan Sr.'s record, however, also includes convictions for robbery and resisting arrest. Although the robbery is over fifty years old, *Pitsilides* requires consideration of the *entire* criminal history and post-conviction conduct indicative of dangerousness—not the predicate offense alone. *Id.* at 212. The Court therefore considers the age of the convictions, the nature of the offenses, and the 2017 probation violation as part of the individualized inquiry.

Mannan Sr.'s charged conduct further bears on that inquiry. The SI charges him with the drug distribution conspiracy and eight substantive distribution counts based on alleged oxycodone and fentanyl sales between November 2022 and July 2023. SI at 1–12. Agent Ennesser reported

that the Revolver was found in Mannan Sr.'s sweat jacket on the first-floor bathroom floor and that Mannan Sr. admitted the Revolver was his. Ennesser Report ¶ 4. Although the Court does not resolve at this stage where the Revolver was recovered, the reported statement and surrounding circumstances nevertheless bear on the individualized dangerousness inquiry.

Mannan Sr.'s two remaining arguments do not alter the outcome. Sr. Reply at 13 & n.4. The first concerns the Revolver's reportedly stolen character, but the Revolver's origin is immaterial. It is not an element of the charged crime, *see* 18 U.S.C. § 922(g)(1), and the Court does not rely on it. Mannan Sr. also contends that if the Revolver's characteristics bear on the analysis, so should its rusty condition when seized. Sr. Reply at 13 n.4; Ballistics Report. But weapon operability is not part of the statutory definition of "firearm," which reaches any weapon that "will or is designed to or *may readily be converted* to expel a projectile by the action of an explosive." 18 U.S.C. § 921(a)(3)(A) (emphasis added). A revolver returned to firing condition by a few hours of soaking is one that "may readily be converted."

On this record, § 922(g)(1) is constitutional as applied to Mannan Sr., and his Motion to dismiss Count Fourteen is **DENIED *without prejudice***.

### C. Facial Challenges

Both Defendants also bring facial challenges. Sr. Mot. at 24 n.7; Jr. Reply at 18–19. Those challenges fail. A facial challenge requires a defendant to "establish that no set of circumstances exists under which the Act would be valid." *Rahimi*, 602 U.S. at 693 (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). Section 922(g)(1) has valid applications to dangerous felons, as the analysis above shows, and to persons still serving their sentences. *See Moore*, 111 F.4th at 273. Because § 922(g)(1) is constitutional as applied to each Defendant, each facial challenge

"also fails." *Id.* at 273 n.5. The Motions to dismiss Counts Thirteen and Fourteen are therefore **DENIED *without prejudice***, both facially and as applied.

## IV. MANNAN SR.'S MOTION TO SUPPRESS

Mannan Sr. moves to suppress evidence seized during the August 24, 2023 search on two theories: (1) the Warrant failed to particularly describe the place to be searched; and (2) the agents' failure to leave a copy of the Warrant violated Rule 41(f)(1)(C). Sr. Mot. at 26–34.[16] As explained below, neither theory warrants suppression or a hearing.

### A. The Warrant Particularly Described the Residence

The Warrant expressly described the Residence as a two-family house, and the supporting affidavit disclosed the two mailboxes and the uncertainty about whether the floors were separate apartments. Warrant Aff. ¶ 7 & at 4 n.1. It was not a general warrant for an undifferentiated structure. Indeed, the Warrant Affidavit set out facts connecting both Defendants to occupants of both floors and asserted that the Defendants exercised dominion and control over the entire Residence. *Id.* ¶¶ 7–9. Those facts supplied probable cause to search the entire premises and, in any event, the executing officers' reliance on the Warrant was objectively reasonable.

#### *1. Fourth Amendment framework*

The Fourth Amendment requires a warrant to describe with particularity "the place to be searched," a requirement intended to prevent general searches by confining the search to places supported by probable cause. *Maryland v. Garrison*, 480 U.S. 79, 84 (1987). In the multi-unit

[16] Mannan Jr. joins Mannan Sr.'s Motion to the extent that it is not inconsistent with his defense. Jr. Mot. at 1. The analysis in this Section applies equally to Mannan Jr. because his privacy interest extends to his basement bedroom, the Warrant authorized a search of that bedroom for the reasons discussed below, and the Rule 41(f) analysis does not vary by Defendant.

context, the particularity principle has produced two distinct lines of authority, and the parties' dispute reduces to which line governs this Warrant.

The first line (relied on by the defense) governs warrants that conceal or mistake a building's multi-unit character. "[A] search warrant directed against an apartment house will usually be held invalid if it fails to describe the particular apartment to be searched." *United States v. Busk*, 693 F.2d 28, 30 (3d Cir. 1982) (citation omitted). A warrant's validity is judged "on the basis of the information that the officers disclosed, or had a duty to discover and to disclose, to the issuing Magistrate," and officers who know, or should know, that a building contains separate units are "obligated to exclude" from the search any unit for which probable cause is lacking. *Garrison*, 480 U.S. at 85; *see United States v. Ritter*, 416 F.3d 256, 264–67 (3d Cir. 2005) (applying *Garrison* where the warrant described what appeared to be a single residence and officers discovered its multi-unit character mid-search).

The second line (relied on by the Government) governs warrants that disclose the building's multi-unit character. A single warrant may authorize the search of an entire multi-unit building where "the target of the search has access to or control over the entire premises." *Torres v. United States*, 200 F.3d 179, 186–87 (3d Cir. 1999) (collecting cases holding the same); *see United States v. Thompson*, No. 20-4054, 2023 WL 5091187, at *2 (2d Cir. Aug. 9, 2023) (upholding a single warrant for a "two-family home" where the affidavit established probable cause as to both apartments). Even *United States v. Votteller*—Defendants' lead authority—recognizes that a warrant describing "an entire building when cause is shown for searching only one apartment" is not void where the building is "actually being used as a single unit." 544 F.2d 1355, 1363 (6th Cir. 1976).

#### 2. *The Warrant*

This case aligns with *Torres*. The Warrant did not conceal or misconstrue any facts. It informed Judge Espinoza that the Residence was "a two-family house," showed him a photograph of it, and disclosed the "two mailboxes at the front door." Warrant Aff. at 2, 9. The Warrant Affidavit connected Defendants to (1) the objects of the search, (2) the entire Residence, and (3) the Residence's occupants. *See id.* The Warrant Affidavit provided key, nuanced details:

- It averred that both Defendants "reside at and have access to" the Residence and "have relationships with the registered occupants of both floors." Warrant Aff. at 8–11.
- It stated that surveillance repeatedly showed Defendants leaving the Residence shortly before drug sales and returning shortly after. *Id.*
- It explained that Defendants exercised "dominion and control" over the premises and performed chores, such as Mannan Sr. taking the garbage cans to the curb for both units. *Id.*
- It detailed how Mannan Jr. twice drove a car registered to the second-floor occupant, once with suspected oxycodone inside. *Id.*
- And it described how Mannan Jr. had previously lived with many occupants of both floors, one of whom had a 2019 conviction for conspiracy to distribute controlled substances. *Id.*

Taken together, Judge Espinoza had a "substantial basis" to conclude that the objects of the search might be found throughout the Residence. *Ritter*, 416 F.3d at 264 (quoting *Illinois v. Gates*, 462 U.S. 213, 236 (1983)).[17]

---

[17] And even if some portion of the Warrant's description were overbroad, the remedy would be redaction of the invalid portion and suppression only of items seized under it—not blanket

Mannan Sr. counters that the unit-connecting facts—chores, car access, prior co-residence—are individually "innocent." Sr. Reply at 2–5. But that objection misunderstands probable cause. Probable cause is a totality standard that does not require each factor to be treated in isolation. *See Gates*, 462 U.S. at 236; *Ritter*, 416 F.3d at 264. So it does not matter that each unit-connecting fact is "innocent." What matters is whether those facts, when taken together, establish probable cause. *See Halsey v. Pfeiffer*, 750 F.3d 273, 302 (3d Cir. 2014) ("[A] court should not isolate pieces of evidence when it determines whether there was probable cause for a prosecution" but instead "should measure the cumulative weight of all of the evidence and account for reasonable inferences that can be drawn from it.").

*3. Standing*

An independent problem underpins the warrant particularity analysis. Fourth Amendment rights "are personal rights which may not be vicariously asserted." *Rakas v. Illinois*, 439 U.S. 128, 133–34 (1978) (citation modified). A defendant "bears the burden of proving that he had a legitimate expectation of privacy" in the place searched. *United States v. Stearn*, 597 F.3d 540, 551 (3d Cir. 2010) (citation modified). At minimum, Defendants have a legitimate expectation of privacy in their own basement quarters. To the extent that any asserted overbreadth rests solely on the privacy interests of other residents in separate apartments, Defendants may not vicariously assert those interests. *See Rakas*, 439 U.S. at 134 (explaining that evidence obtained from a search of a third person's premises or property does not infringe the defendant's Fourth Amendment rights).

---

suppression of evidence seized under the portion that remains valid. *United States v. Christine*, 687 F.2d 749, 754 (3d Cir. 1982).

*4. Good faith exception*

Finally, even if the Warrant were defective, the good faith exception would independently defeat suppression. Evidence seized under a warrant later held invalid is not suppressed where the executing officers acted in objectively reasonable reliance on that warrant. *United States v. Leon*, 468 U.S. 897, 922–23 (1984). The inquiry on whether the good faith exception applies ordinarily begins and ends with the warrant itself because a warrant's "mere existence . . . typically suffices to prove that an officer conducted a search in good faith." *United States v. Hodge*, 246 F.3d 301, 307–08 (3d Cir. 2001); *see United States v. Caesar*, 2 F.4th 160, 170 (3d Cir. 2021) (noting that a warrant's existence "will obviate the need for any deep inquiry into [the] reasonableness of the officers' reliance on the warrant" (internal quotation marks and citation omitted)).

The presumption that an officer acted in good faith when executing a warrant yields in four situations, where: (1) the issuing judge relied on a deliberately or recklessly false affidavit; (2) the judge abandoned the neutral and detached judicial role; (3) the affidavit was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; or (4) the warrant was "so facially deficient that it fail[ed] to particularize the place to be searched or the things to be seized." *Hodge*, 246 F.3d at 308 (quoting *United States v. Williams*, 3 F.3d 69, 74 n.4 (3d Cir. 1993)). Mannan Sr. invokes only the fourth category, arguing that the Warrant's failure to particularize his residence within the multi-unit building made reliance on it unreasonable. Sr. Reply at 6.

The fourth category asks whether the Warrant's deficiency was "*so* facially deficient" that it was apparent to the officers who executed it. *Hodge*, 246 F.3d at 308 (emphasis added). Here, it was not. The Warrant identified the Residence by street address, photograph, structural description, and contents, and it disclosed the very feature—the Residence's two-family

character—that Mannan Sr. now says invalidates it. In fact, Defendants' particularity challenge fails at every step: the Warrant was sufficiently particular, and even if it were not, the officers' reliance on it was objectively reasonable. *See United States v. Bagley*, 674 F. App'x 169, 171 (3d Cir. 2017) (rejecting a particularity challenge to a warrant describing an apartment in a multi-unit building and holding, in the alternative, that the good-faith exception applied because "any ambiguity in th[e] warrant" did not render it "so facially deficient that it failed to particularize the place to be searched").

### B. The Rule 41(f)(1)(C) Violation Does Not Warrant Suppression

Rule 41(f)(1)(C) directs the officer executing a warrant to "give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken," or to "leave a copy of the warrant and receipt at the place where the officer took the property." Fed. R. Crim. P. 41(f)(1)(C). That did not happen here. Residents asked for the Warrant repeatedly during the search and were given evasive responses: "It's in the van"; "We'll show it to you later"; "talk to your landlord." Flanagan Aff. ¶ 3; Mannan Sr. Aff. In fact, Mannan Sr.'s renewed request in the car drew only a three-word response, "We got it." *Id.* No copy was given to any Residence occupant or left at the Residence, and the defense first saw the Warrant in discovery some eight months later. Sr. Mot. at 4. The Government attacks the form of the defense's proof (affidavits) but nowhere denies the failure itself. Opp'n at 12–14; Sr. Reply at 6. The Court therefore treats the violation as established. The question is what consequence, if any, must follow.

The answer depends on the character of the violation. Rule 41 violations come in "two categories: those involving constitutional violations, and all others." *United States v. Werdene*, 883 F.3d 204, 213 (3d Cir. 2018) (quoting *United States v. Simons*, 206 F.3d 392, 403 (4th Cir.

2000)). "[N]either the Fourth Amendment nor Federal Rule of Criminal Procedure 41" requires "the executing officer [to] present the property owner with a copy of the warrant before conducting his search." *United States v. Wright*, 777 F.3d 635, 641 (3d Cir. 2015) (quoting *United States v. Grubbs*, 547 U.S. 90, 98–99 (2006)).

But the warrant delivery obligation is "essentially ministerial," and a failure that "occurred only after a valid search and seizure" is "not constitutionally significant." *United States v. Hall*, 505 F.2d 961, 964 (3d Cir. 1974); *see United States v. Cafero*, 473 F.2d 489, 499 (3d Cir. 1973) (holding that delivery of a warrant the day after the search "does not render the search unreasonable"). For such a violation, suppression follows only if the defendant shows "prejudice" affecting the "concepts of fundamental fairness or due process," *Hall*, 505 F.2d at 964, or if there is "intentional and deliberate disregard of a provision in the Rule." *United States v. Martinez-Zayas*, 857 F.2d 122, 136 (3d Cir. 1988).

Mannan Sr. shows neither. He does not claim prejudice. Indeed, he obtained the Warrant in discovery. As for deliberate disregard, the Court acknowledges that the violation here was not one of forgotten formality but of multiple, varied refusals to produce the Warrant. Deliberate disregard in this setting, however, means official design—not evasive sloppiness. *See United States v. Everett*, 426 F. App'x 112, 114 (3d Cir. 2011). The Third Circuit has declined to suppress evidence in situations, like here, where agents' "sloppiness" in failing to provide the warrant—including allegedly lying about it—did not rise to "bad-faith or intolerable conduct" and caused no prejudice. *Id.* The Circuit also held that suppression for agents' failure to leave the warrant's attachments was "not worth the social cost of excluded evidence." *United States v. Jackson*, No. 23-1615, 2024 WL 2874364, at *4 (3d Cir. June 7, 2024).

Conversely, in *United States v. Slaey*—the case Mannan Sr. presses—the court found prejudice because the Government engineered the deprivation of notice by procuring a court order authorizing the agents to withhold the warrant's operative attachment. 433 F. Supp. 2d 494, 495–99 (E.D. Pa. 2006). Mannan Sr. alleges no such actions here. An inference of deliberate disregard strong enough to trigger the exclusionary rule requires *some* evidence that the failure was designed to conceal the search's authority or scope. Unfulfilled assurances during a 6:00 a.m. multi-unit execution, without more, do not amount to prejudice.

The denial of suppression is not an endorsement of the Government's actions. The warrant delivery requirement "informs the subject of the search of the lawful authority of the executing officer, his need to search, and the limits of his power to search." *United States v. Tracey*, 597 F.3d 140, 146 (3d Cir. 2010) (citation modified) (quoting *Groh v. Ramirez*, 540 U.S. 551, 561 (2004)). "After a search concludes, agents must leave behind a copy of the warrant" and its attachments, absent a sealing order. *Jackson*, 2024 WL 2874364, at *4. The Court expects agents executing warrants issued in this District to comply with Rule 41(f), and it expects the Government to ensure that they do.

**C. No Evidentiary Hearing Is Required**

A suppression motion earns an evidentiary hearing only if it is "sufficiently specific, non-conjectural, and detailed" to present "(1) a colorable constitutional claim" resting on "(2) disputed issues of *material* fact that will affect the outcome." *United States v. Hines*, 628 F.3d 101, 105 (3d Cir. 2010) (citation modified) (emphasis added); *see United States v. Voigt*, 89 F.3d 1050, 1067 (3d Cir. 1996) (holding a colorable claim requires "more than mere bald-faced allegations of misconduct"). "Not every issue of fact is an issue of material fact." *Hines*, 628 F.3d at 105.

Mannan Sr.'s theories do not clear the materiality bar. The particularity challenge is purely legal and presents no factual dispute. Mannan Sr. does not dispute what the Warrant and Affidavit say; he disputes what they establish, arguing that the facts the affidavit recites were insufficient to extend probable cause to the entire Residence. That is a legal argument about an undisputed record, and testimony could not advance it.

The Rule 41(f) challenge rests on a factual record, but no dispute exists that is material enough to change this case's outcome. The Government has never denied that no copy of the Warrant was given to any occupant or left at the Residence. It objected instead that the defense's original proof was an anonymous investigator's affidavit, Opp'n at 12–14, and Mannan Sr.'s own sworn affidavit has since answered that objection, *see* Mannan Sr. Aff. The Court has accordingly treated the violation as established. *See supra* Section IV.B. What remains unknown is *why* the agents failed to comply.

But the reason behind the agents' noncompliance does not change the outcome. Mannan Sr. claims no prejudice, and he has proffered nothing resembling deliberate nondisclosure. Testimony that the agents were careless, distracted, or indifferent would establish negligence, which is not enough to merit a hearing. *See United States v. Deaner,* 1 F.3d 192, 200–01 (3d Cir. 2025). Put simply, a hearing is not required where, as here, the movant's legal position would fail even if he proved his factual account. *See United States v. Cuevas-Almonte*, 156 F.4th 319, 325–27 (3d Cir. 2025) (holding that a hearing is unnecessary when the disputed facts would not affect the motion's outcome). Mannan Sr.'s Motion to suppress and request for an evidentiary hearing are therefore **DENIED**.

## V. MANNAN JR.'S MOTION TO DISMISS OR SUPPRESS FOR FAILURE TO PRESERVE EVIDENCE

Mannan Jr. moves to dismiss the SI or suppress the search evidence on a distinct theory: that the agents violated his due process rights by destroying the evidentiary context of the seized items by moving the drugs, rifle, drum magazine, and ammunition before photographing them. Jr. Mot. at 8–13. He seeks discovery of DEA documentation protocols and the searching agents' identities, roles, and instructions, as well as an evidentiary hearing. *Id.* at 13. Given the issues with documenting the Residence search, the Court will **ORDER in part** the narrow discovery Mannan Jr. requests. However, Mannan Jr.'s suppression argument fails on settled law.

**A. Governing Law**

Due process imposes a narrow duty to preserve evidence which turns on what the evidence was worth when it was lost. Evidence whose "exculpatory value was apparent before the evidence was destroyed," that the defendant cannot replace "by other reasonably available means," may not be destroyed at all. *California v. Trombetta*, 467 U.S. 479, 489 (1984). Loss of such evidence violates due process regardless of the Government's reason. *See id.* Evidence that was merely "potentially useful" receives less protection. *Arizona v. Youngblood*, 488 U.S. 51, 57–58 (1988). Its loss violates due process only if the defendant "can show bad faith on the part of the police." *Id.* Whether *Trombetta* or *Youngblood* applies "depend[s] not on the centrality of the contested evidence . . . but on the distinction between material exculpatory evidence and potentially useful evidence." *Illinois v. Fisher*, 540 U.S. 544, 549 (2004) (per curiam).

The Third Circuit construes the *Youngblood* bad-faith requirement strictly. Bad faith "must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." *Griffin v. Spratt*, 969 F.2d 16, 20 (3d Cir. 1992) (citation omitted). A departure from standard procedure "may permit" an inference of bad faith but "does not syllogistically imply" one, and conduct that is "at most . . . negligent" does not violate due process.

*Deaner*, 1 F.3d at 200–01; *see United States v. Ramos*, 27 F.3d 65, 72 (3d Cir. 1994) (holding that destruction of rough notes in violation of the Circuit's own preservation rules did not establish bad faith). An argument that a preservation failure "violated police procedures and, *ipso facto*, establishes bad faith" is an argument "[p]recedent forecloses." *United States v. Henry*, 842 F. App'x 809, 815 (3d Cir. 2021).

**B. Evidence Was Not Destroyed, and the Documentation Failures Do Not Show Bad Faith**

*Trombetta* and *Youngblood* govern evidence the Government once had and lost. The threshold question therefore is what evidence was lost. None was lost here. The seized items themselves—the Rifle, the drum magazine, the ammunition, and the drugs—were preserved and produced. Nemes Report ¶ 7; Opp'n at 11 (characterizing the claimed deficiency as a failure to create records rather than a failure to preserve existing evidence). What Mannan Jr. challenges is the documentation the agents never created in the first place: wide-angle photographs, video, and a contemporaneous record of where each item sat. The Government has a duty to preserve—not to generate a record that defendants may find helpful. *See Youngblood*, 488 U.S. at 59 ("[T]he police do not have a constitutional duty to perform any particular tests."). Mannan Jr.'s claim fails because it assumes a right to records that never existed.

Mannan Jr.'s Reply answers the Opposition by identifying a different loss. By moving items before photographing them, he argues, the agents destroyed the scene itself. Jr. Reply at 1–5. In other words, he argues that the spatial context in which the items were found was within the Government's control and cannot be recreated. *Id.*

The Court finds that characterization is correct. The claim still fails, however, because any lost context was at most potentially useful. *See United States v. Stevens*, 935 F.2d 1380, 1388 (3d Cir. 1991) (holding there was no bad faith when the Government pursued a forensic test that

consumed a potentially exculpatory semen sample that "either might have inculpated or exculpated" the defendant and "no one knew" which). Evidence is materially exculpatory only if its exculpatory value was apparent at that time, *Trombetta*, 467 U.S. at 489, while potentially inculpatory evidence is only potentially useful, *Youngblood*, 488 U.S. at 57–58.

The *Youngblood* line applies here. When the agents moved the items on the morning of August 24, 2023, it was unclear what a wide-angle photograph of the right bedroom would show. The photograph just as easily could have shown either Mannan Jr.'s belongings or a stranger's belongings beside the Rifle. The former would be inculpatory; the latter would not. And Mannan Jr. does not contend otherwise. He argues that the context "could have" shown that the basement's contents were commingled. Jr. Mot. at 11. Such evidence might have helped him, but it's uncertain whether it would have. The evidence's loss therefore offends due process only on a showing of bad faith. *Youngblood*, 488 U.S. at 58.

Mannan Jr. has not shown bad faith. The record he assembles establishes a poorly documented search: close-range photographs of items staged on a basement couch, no video, no photographs of the Residence before or after, and conflicting reports about where the Revolver was found. Jr. Mot. at 5–7; D.E. 79-5, Exs. D-1 to D-7. But departure from an agency's practice supports an inference of negligence rather than the "conscious effort to suppress exculpatory evidence" that bad faith requires. *Trombetta*, 467 U.S. at 488.

Mannan Jr. notes that the agents photographed with care when the image inculpated him—a close-up clear enough to read his name on an unsigned bank-account application—yet photographed nothing around the image that could be potentially exculpatory. Jr. Mot. at 7; *see* D.E. 79-5, Ex. D-7. Selective documentation of that kind could support an inference of bad faith on some records. It cannot on this record. Bad faith "must necessarily turn on the police's

knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." *Griffin*, 969 F.2d at 20. The close-range practice obscured context indiscriminately and might have helped the Government as readily as the defense.

Moreover, nothing in the record suggests that the agents knew what the undocumented context would show—much less that they left it undocumented because it favored Mannan Jr. The conflicts between the Nemes Report and the Ennesser Report are impeachment material, and the Government will have to answer for them at trial. *See United States v. Starusko*, 729 F.2d 256, 260–61 (3d Cir. 1984) (holding that where a second law enforcement report recorded a statement inconsistent with what the same witness had said a day earlier, the inconsistency could "be used to impeach" the witness's credibility and is therefore disclosable exculpatory material); *Trombetta*, 467 U.S. at 490 (noting that a defendant deprived of physical evidence retains the ability to cross-examine the officers and challenge the reliability of the Government's proof). But the conflicts are not evidence of bad faith.

**C. Limited Discovery Is Warranted; an Evidentiary Hearing Is Not**

The discovery Mannan Jr. seeks does not depend on his constitutional theory. He asks for three items: (1) the identities and assigned roles of the agents who participated in the Residence's search; (2) the DEA evidence-documentation protocols applicable to the August 24, 2023 search; and (3) any instructions the agents received about documenting that search. Jr. Mot. at 13; Jr. Reply at 7–8. Two provisions of Rule 16 govern the requests. Rule 16(a)(1)(E)(i) entitles a defendant to inspect items within the Government's possession that are "material to preparing the defense." Fed. R. Crim. P. 16(a)(1)(E)(i). Rule 16(a)(2) excludes from that entitlement "reports, memoranda, or other internal government documents made by an attorney for the government or

other government agent in connection with investigating or prosecuting the case." Fed. R. Crim. P. 16(a)(2). The three requests fare differently under these two provisions.

*First*, the agents' identities and assigned roles must be produced. A list of the agents who searched the Residence and their assigned roles is neither a report, a memorandum, nor an internal document prepared in connection with the investigation, so Rule 16(a)(2) does not reach this request. Indeed, the roster is material under Rule 16(a)(1)(E)(i). The Nemes Report and the Ennesser Report conflict about where the Revolver was recovered and where Defendants were arrested. *Compare* Nemes Report ¶¶ 4–5, 8, *with* Ennesser Report ¶¶ 3–4. The agents who conducted the search are the witnesses through whom the Government must prove where each seized item was found. Evidence bearing on the credibility of those witnesses is material to the defense Mannan Jr. must prepare. *See United States v. Hill*, 976 F.2d 132, 134–35 (3d Cir. 1992) (holding that the disclosure obligation reaches materials that "might affect the jury's judgment of the credibility of a crucial prosecution witness"). The Government's Opposition does not respond to the request. *See* Opp'n at 10–11.

*Second*, the protocols request will be granted in modified form. A standing DEA policy on documenting searches is not made "in connection with investigating or prosecuting" this case, so Rule 16(a)(2) does not shelter the policy. Fed. R. Crim. P. 16(a)(2). The policy is also "material to preparing the defense." Rule 16(a)(1)(E)(i). An item is material if it bears on the defendant's response to the Government's case-in-chief. *See United States v. Armstrong*, 517 U.S. 456, 462 (1996). The DEA policies are material because a departure from established protocol "may permit" an inference of bad faith even though it cannot compel one. *Deaner*, 1 F.3d at 200. Good faith is judged in part by whether officials acted "in accord with their normal practice." *Trombetta*, 467 U.S. at 488. Moreover, the policy will frame the trial examination of the searching agents

about the documentation failures described above. *See United States v. Marshall*, 132 F.3d 63, 68 (D.C. Cir. 1998) (holding that evidence is material under Rule 16 where "there is a strong indication that it will play an important role in uncovering admissible evidence, aiding witness preparation, corroborating testimony, or assisting impeachment or rebuttal"). Mannan Jr. states that there are no publicly available DEA policies on documenting searches. Jr. Mot. at 11. The Government shall therefore either (1) produce any DEA policy or guidance in effect on August 24, 2023 that governed the documentation of evidence locations during the execution of a search warrant, or (2) certify in writing that no such policy or guidance exists. If the Government contends that a responsive policy is law enforcement sensitive, the Government shall submit the policy to the Court for in camera review together with a written justification for withholding the policy from Mannan Jr. and an explanation why it did not originally oppose.

*Third*, the instructions request is denied. Any case-specific direction to the searching agents about documenting this search—whether recorded in an operations plan, a briefing document, or correspondence—is an internal government document "made by an attorney for the government or other government agent in connection with investigating or prosecuting the case." Fed. R. Crim. P. 16(a)(2). Rule 16 does not authorize discovery of such a document. The denial does not exempt the Government's constitutional obligations: an internal instruction that is exculpatory or impeaching remains disclosable under *Brady v. Maryland*, 373 U.S. 83, 87 (1963), and *Giglio v. United States*, 405 U.S. 150, 154 (1972).

The Government shall produce the agents' identities and assigned roles, and shall make the protocols production or certification, within **thirty days** of the accompanying Order.

Given the limited discovery here, an evidentiary hearing would be premature. A hearing requires disputed issues of material fact, and "its purpose is not to assist the moving party in

making discoveries that, once learned, might justify the motion after the fact." *Hines*, 628 F.3d at 105. The facts on which this Motion rests—the photographic practices, the absence of video, the conflicts between the reports—are documented, and the Court has taken them into account. *Id.* at 108 (requiring a defendant seeking a hearing to "identify facts material to that claim" and "show why the facts are disputed"). A hearing has nothing to resolve unless the ordered discovery produces a genuine and material dispute. Mannan Jr.'s request for a hearing is therefore **DENIED.**

* * *

Mannan Jr. has identified a flawed search, but not a due process violation. No materially exculpatory evidence was lost, and the record does not support an inference of bad faith. Mannan Jr.'s Motion to dismiss the SI or suppress the search evidence is therefore **DENIED**. His discovery requests are **GRANTED in part** as set forth above and in the accompanying Order and are otherwise **DENIED**.

## VI. MOTIONS TO SEVER

Both Defendants move under Rule 14 to sever their trials on two grounds: (1) that they will present mutually antagonistic defenses to the firearm counts, and (2) that their nearly identical names will confuse the jury. Sr. Mot. at 34–39; Jr. Mot. at 13–14.

### A. Governing Law

Defendants indicted together are preferably tried together to "promote efficiency and serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts." *United States v. Urban*, 404 F.3d 754, 775 (3d Cir. 2005) (quoting *Zafiro v. United States*, 506 U.S. 534, 537 (1993)). The preference for joint trials is strongest where the defendants are charged under a single conspiracy. *Voigt*, 89 F.3d at 1094. Rule 14 permits severance only where a joint trial creates "a

serious risk that [it] would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro*, 506 U.S. at 539.

The burden of showing prejudice rests on the movant. *United States v. Eufrasio*, 935 F.2d 553, 568 (3d Cir. 1991). It is a heavy one: he must show "clear and substantial prejudice resulting in a manifestly unfair trial," *Urban*, 404 F.3d at 775, not merely that he would have fared better at a trial of his own, *Gov't of the V.I. v. Sanes*, 57 F.3d 338, 341 (3d Cir. 1995) (citation omitted). Even where some prejudice appears, the remedy rests with the Court. *Zafiro*, 506 U.S. at 541.

Mutually antagonistic defenses are one recognized source of potential prejudice, but they "are not prejudicial per se." *Zafiro*, 506 U.S. at 538. Defenses are mutually antagonistic only where acquitting one codefendant would "call for" convicting the other. *Voigt*, 89 F.3d at 1094–95. Ordinary "finger-pointing and blame-shifting among coconspirators" does not qualify. *Id.*

"A defendant is not required to show that a jury would be left with no other option *but* to convict him if a jury believes his co-defendant." *United States v. Green*, 114 F.4th 163, 173 (3d Cir. 2024). He must show only that the defenses convert the trial into a "triangular prosecution" between the Government and the two defendants. *Green*, 114 F.4th at 172–73, 177. Defenses are less likely to be mutually antagonistic where they arise within a charged conspiracy. *See id.* at 176. If defenses are genuinely antagonistic, however, "a limiting instruction will likely prove insufficient to cure prejudice." *Id.* at 180. In determining whether a defense is mutually antagonistic, courts rely on what is known or "reasonably foreseeable" when the motion is decided. *Id.* at 171–72. Severance motions, however, are "frequently made and infrequently granted." *Id.*

### B. The Firearms Defenses Are Reconcilable Blame Shifting—Not Mutual Antagonism

Mannan Jr. anticipates defending Count Thirteen on the ground that the Rifle, the drum magazine, and the drugs in the shared basement "could have belonged to other members of the

home, including Mannan Sr." Jr. Mot. at 13–14. Mannan Sr. explains the false choice he says will follow: if the Rifle sat in a basement where only he and his son slept, acquitting one of them necessarily calls for convicting the other. Sr. Mot. at 36–37.

The argument fails because the charges here are not structured to present that choice. *Green* involved a single kidnapping charged against both defendants. 114 F.4th at 181. Their defenses could not coexist because while one defendant said the kidnapping occurred under duress, the other stated that no kidnapping occurred at all. *See id.* So a juror who credited one defense necessarily rejected the other. *Id.* Here, by contrast, each Defendant is charged only with his own firearm. Count Thirteen charges Mannan Jr. with the Rifle; Count Fourteen charges Mannan Sr. with the Revolver. SI at 13–14. A jury that credits Mannan Jr.'s theory that the Rifle belonged to his father acquits Mannan Jr. and convicts no one because Mannan Sr. is not charged with possession of the Rifle. The mutual exclusivity that made *Green* a triangular prosecution is therefore absent.

The defenses are reconcilable for two other reasons. *First*, Mannan Sr. has asserted no defense that attributes the Revolver to his son. Mannan Sr. is reported to have claimed the Revolver as his own, Ennesser Report ¶ 4, a statement that helps Mannan Jr. rather than antagonizes him. *Second*, a jury may acquit both Defendants on the view that the Government has not proved possession by either, or it could convict both, because dominion and control "need not be exclusive but may be shared." *See United States v. Introcaso*, 506 F.3d 260, 271 (3d Cir. 2007) ("Mere proximity is enough to demonstrate constructive possession."). Because it is not "logically impossible" for the jury to believe both defenses, or neither, the defenses are not mutually exclusive. *Voigt*, 89 F.3d at 1096. Defendants have not shown genuine antagonism, therefore *Green*'s holding that limiting instructions cannot cure it is not triggered. *Id.* at 180.

### C. Defendants' Names Do Not Require Severance

The name confusion ground fares no better. Defendants press *United States v. Coward*, 630 F.2d 229, 230–32 (4th Cir. 1980), where the Fourth Circuit reversed after the prosecutor confused two similarly named defendants during closing argument. Sr. Mot. at 38–39. But in *Coward*, two separate conspiracies had been tried as one, and the name confusion was a symptom of that misjoinder rather than an independent ground for severance. 630 F.2d at 230–32. Where joinder is proper, courts routinely try relatives bearing similar or identical names together. *See, e.g.*, *United States v. Walker*, 657 F.3d 160, 170–71 (3d Cir. 2011) (affirming denial of severance where brothers Barron and Barry Walker were tried jointly on drug trafficking, § 924(c), and § 922(g) counts because the jury could compartmentalize the evidence as to each and the district court instructed it to give separate consideration to each charge against each defendant); *United States v. DeCologero*, 530 F.3d 36, 46 (1st Cir. 2008) (declining to presume that codefendants' similar names caused jury confusion where the jurors had spent two months observing the defendants and the court repeatedly instructed them to consider each defendant separately).

The question is whether the jury "could have been reasonably expected to compartmentalize the allegedly prejudicial evidence in light of the quantity and limited admissibility of the evidence." *Eufrasio*, 935 F.2d at 568. Should this case proceed to trial, the jury here could indeed compartmentalize the allegedly prejudicial nature of Defendants' names. The Court and the parties would use clear designations—"Mannan Sr." and "Mannan Jr."—throughout trial, provide a verdict sheet keyed to each count and to each Defendant's full name, and instruct the jury at empanelment and again at the close of evidence to consider each Defendant,

and each count, separately. Juries are presumed to follow such instructions, *Zafiro*, 506 U.S. at 540–41, and Defendants offer no reason to think a jury here would be any different.

The Motions to sever are **DENIED**.

## VII. DISCOVERY MOTIONS

Both Defendants seek additional pretrial discovery: (1) exculpatory and impeachment material, (2) notice under Federal Rule of Evidence 404(b), (3) expert disclosures, (4) Jencks Act material, (5) preservation of law enforcement rough notes, (6) a hearing under Federal Rule of Evidence 609, and (7) leave to file additional motions. Sr. Mot. at 39–41; Jr. Mot. at 16.

The Government acknowledges most of its obligations, asks that the specific requests be denied as premature because no trial date is set, and cross-moves for reciprocal discovery. Opp'n at 34–39. The Court holds the Government to the obligations it acknowledges, declines to set deadlines that must await a trial date, and grants requests that warrant immediate relief.

### A. Exculpatory and Impeachment Material

The Government acknowledges its continuing obligations under *Brady* and *Giglio* and represents that it has complied and will continue to comply with those obligations. Opp'n at 34. Mannan Sr. responds that an assurance of compliance is a reason to grant the request as unopposed, not to deny it as moot. Sr. Reply at 18. The Court agrees. Due process requires disclosure "in time for its effective use at trial," *United States v. Higgs*, 713 F.2d 39, 44 (3d Cir. 1983), and the Court retains discretion to order earlier disclosure where necessary to avoid disrupting the trial, *see United States v. Starusko*, 729 F.2d 256, 261 (3d Cir. 1984). The Motions are **GRANTED** to the extent they seek continued compliance with *Brady*, *Giglio*, and their progeny.

Defendants, however, request more. Specifically, Defendants request review and production of the case agents' personnel files. Defendants seek those files to identify bias, prior

misconduct, and reprimands bearing on the credibility of the officers who conducted the controlled buys and executed the warrant. Sr. Mot. at 39–40; Jr. Mot. at 16. But Defendants' requests are too generalized. Where a defendant offers no reason to believe that a particular file contains exculpatory or impeachment material, the Government "need only direct the custodian of the files to inspect them for exculpatory evidence and inform the prosecution of the results of that inspection, or, alternatively, submit the files to the trial court for in camera review." *United States v. Dent*, 149 F.3d 180, 191 (3d Cir. 1998). The Government shall follow that procedure as to each testifying agent. Defendants' broader request for production of the case agents' personnel files is therefore **DENIED**.

**B. Additional Requests**

*Rule 404(b) notice.* The request for immediate notice of other-acts evidence is **DENIED** as **premature**. No trial date is set, and this District's practice under Standing Order 15-2 is to fix the notice date at the final pretrial conference. Opp'n at 35. The Government's Opposition recites the pre-2020 version of the Rule, under which notice was required only "upon request" and needed to describe no more than the evidence's "general nature." *Id.* at 34–35. The 2020 amendments deleted the request requirement and now oblige the prosecutor to "articulate in the notice the permitted purpose for which the prosecutor intends to offer the evidence and the reasoning that supports the purpose," in writing and before trial. Fed. R. Evid. 404(b)(3)(B)–(C). The notice the Government serves must satisfy the current Rule. Admissibility may be raised by motion *in limine* once notice is given.

*Expert disclosures.* The request for immediate expert disclosures is **DENIED** as **premature** for the same reason. The Government has identified its anticipated expert subjects—firearm operability, interstate nexus, and drug identification—and commits to disclosure with

sufficient notice before trial. Opp'n at 37. Rule 16 requires a complete statement of each expert's opinions, the bases and reasons for them, and the witness's qualifications and prior testimony, on a deadline the Court sets. Fed. R. Crim. P. 16(a)(1)(G). The pretrial scheduling order will contain that deadline.

*Jencks Act material.* The request to compel early production of witness statements is **DENIED** as **premature**. No statement of a Government witness "shall be the subject of subpoena, discovery, or inspection until said witness has testified on direct examination." 18 U.S.C. § 3500(a). A district court may not order earlier disclosure. *See United States v. Murphy*, 569 F.2d 771, 773 (3d Cir. 1978). But early production remains the encouraged practice: courts in this District promote "early disclosure to obviate trial interruptions," *United States v. Tejada*, Crim. No. 12-312, 2013 WL 3786299, at *6 (D.N.J. July 17, 2013) (citing *United States v. Bissell*, 954 F. Supp. 841, 871 (D.N.J. 1996)), and early disclosure also permits counsel to advise their clients on the development of the case, including the assessment of any plea offer, *see United States v. Coles*, 511 F. Supp. 3d 566, 578 (M.D. Pa. 2021). The Government represents that it will produce Jencks material reasonably in advance of trial, Opp'n at 37, and the defense accepts that representation, Sr. Reply at 19. What remains is timing, and timing cannot be fixed before a trial date is set. The parties are therefore **ORDERED** to meet and confer on a schedule for the pretrial disclosure of witness statements—an obligation that reaches Defendants' witnesses as well, *see* Rule 26.2(a)—and to advise the Court of their agreed schedule or their competing positions.

*Rough notes.* The Government must "retain and, upon motion, make available to the district court both the rough notes and the drafts of reports of its agents" so that the court can determine whether they are producible under *Brady* or the Jencks Act. *United States v. Ammar*, 714 F.2d 238, 259 (3d Cir. 1983). This record supplies a concrete reason to enforce that obligation:

the inconsistencies between the Nemes Report and the Ennesser Report make the agents' contemporaneous notes a likely subject of legitimate impeachment and Jencks practice. *See supra* Sections I, V. This request is **GRANTED**. The Government shall direct every participating law enforcement officer to preserve rough notes, draft reports, and related contemporaneous records for the duration of this prosecution.

*Rule 609.* Mannan Sr. seeks a pretrial ruling on whether his prior convictions may be used to impeach him if he testifies. Sr. Mot. at 43. The Government does not oppose resolving the question shortly before trial. Opp'n at 38. The Court agrees that the question should be resolved before trial, but not now. Federal Rule of Evidence 609(a)(1)(B) requires the Court to weigh the probative value of a conviction against its prejudicial effect to the defendant, and that weighing turns on matters that will not be fixed until trial approaches. A ruling entered now would in any event remain subject to revision as the case developed. *See Luce v. United States*, 469 U.S. 38, 41–42 (1984) (observing that a district judge may alter an *in limine* ruling on impeachment, and that the effect of such a ruling cannot be assessed unless the defendant testifies). No trial date has been set. The Court will therefore **GRANT** the request insofar as it seeks a pretrial ruling and **DEFER** the merits to motions *in limine*.

### C. Leave to File Additional Motions

Both Defendants ask the Court to permit the filing of further pretrial motions after the motion deadline has passed. Mannan Sr. requests leave "until the date set for trial," undertaking to notify the Government as soon as the need for a motion becomes apparent. Sr. Mot. at 44. Mannan Jr. frames the request in terms of contingency, seeking leave should "additional facts or circumstances arise" or should additional discovery be produced. Jr. Mot. at 18. The Government does not oppose either request but proposes a condition: that any later motion be "limited to issues

raised by future Government disclosures." Opp'n at 38. Mannan Sr. accepts that further motions be permitted only where they rest on "newly discovered information, or were otherwise unable to [be] filed before that time." Sr. Reply at 19–20. The Defendants' requests for leave to file additional pretrial motions are **GRANTED**, limited to motions resting on grounds that were not reasonably available before the pretrial-motion deadline, and subject to the good cause requirement of Rule 12(c)(3).

### D. Reciprocal Discovery

The Government cross-moves for an order compelling Defendants to produce reciprocal discovery. Opp'n at 38–39. Rule 16(b) makes disclosure a two-way obligation: a defendant who has requested and received the Government's Rule 16(a) disclosures must in turn produce the documents and objects he intends to introduce in his case-in-chief, together with the results of any examination or test he intends to introduce or on which his expert will rely. Fed. R. Crim. P. 16(b)(1)(A)–(B). The obligation continues as new material comes into his possession. Fed. R. Crim. P. 16(c).

Here, both Defendants sought Rule 16 material, the Government represents that it has produced its disclosures and made discovery available, and neither Reply contests that. Opp'n at 38–39. The Government represents, however, that it has received nothing in return, and that the reciprocal production deadline set by the last scheduling order—September 5, 2025—passed without any production. D.E. 68 at 2; Opp'n at 39. Defendants are silent as to the Government's representation.

Relief requires one limitation. The Government asks for production of "all discoverable information," which on its face would reach the defense expert disclosures governed by Rule 16(b)(1)(C). Those disclosures are different. Defendants' obligation under Rule 16(b)(1)(C)

arises only if the Government requests the disclosure and the Government has itself complied with a defense request under Rule 16(a)(1)(G). Fed. R. Crim. P. 16(b)(1)(C)(i). The Government has not yet made a disclosure that satisfies Rule 16(a)(1)(G). The condition on the Defendants' expert obligation has therefore not been met. The Court will set the time for each side's expert disclosures together once a trial date is set. *See* Fed. R. Crim. P. 16(a)(1)(G)(ii), (b)(1)(C)(ii). That deferral, however, does not apply to Defendants' obligations under Rule 16(b)(1)(A) and (B), which were triggered when the Government produced its Rule 16(a) discovery—and are now nearly a year overdue.

The Government's request for an order compelling reciprocal discovery is therefore **GRANTED in part**. Defendants shall produce all material required by Rule 16(b)(1)(A) and (B) within **fourteen days** of the accompanying Order and shall supplement on a rolling basis as Rule 16(c) requires. The request is **DENIED** as to disclosures under Rule 16(b)(1)(C), which the Court will schedule together with the Government's disclosures under Rule 16(a)(1)(G).

## VIII. CONCLUSION

An appropriate Order accompanies this Opinion.

Dated: September 2, 2026

Evelyn Padin, U.S.D.J.